IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-960

Filed 21 May 2024

Onslow County, No. 23 JA 39

IN THE MATTER OF: B.L.M.-S.

Appeal by respondent-father from order entered 10 July 2023 by Judge James W. Bateman, III in District Court, Onslow County. Heard in the Court of Appeals 1 May 2024.

*No brief filed on behalf of petitioner-appellee Onslow County Department of Social Services.*

*Womble Bond Dickinson (US) LLP, by Jacob S. Wharton and Allison T. Pearl, for the guardian ad litem.*

*Edward Eldred for respondent-appellant father.*

ARROWOOD, Judge.

Respondent-father appeals from the trial court's order adjudicating his infant son to be an abused and neglected juvenile, contending the trial court erred in its disposition concerning visitation and reunification efforts. For the following reasons, we affirm in part and remand.

I.     Background

"Ben"[1] was born on 21 November 2022 to respondent-father and the mother,[2] a young married couple living in Jacksonville. The Onslow County Department of Social Services ("DSS") became involved with the family on 27 January 2023 when it received a report raising concerns about the child's failure to thrive, broken ribs, and exposure to domestic violence. Specifically, DSS learned that a primary care provider became concerned by Ben's failure to thrive at a routine appointment on 25 January 2023, and after the child was found to have lost more weight at a follow-up visit the next day, Ben was admitted to a local hospital, where concerns about possible fractures arose. Ben was transferred to ECU Health for medical treatment, where he was discovered to have two broken ribs at different stages of healing.

The parents, who were Ben's only caregivers, could not provide a satisfactory explanation for the injuries, and respondent-father admitted to a social worker that on more than one occasion when Ben cried, he squeezed and shook his son out of frustration. Respondent-father also admitted to a Jacksonville Police Department detective that he had once thrown Ben into the air and failed to catch the child and further described squeezing Ben "with a force equivalent to that used to squeeze vice grips." As a result, respondent-father was charged with a single count of misdemeanor child abuse. DSS also expressed concerns regarding domestic violence between respondent-father and the mother. Due to these circumstances, DSS

---

[1] The stipulated pseudonym for the juvenile.
[2] The mother is not a party to this appeal.

believed that respondent-father should not have any contact with Ben and that the mother required supervision to care for Ben. Ben's paternal grandmother began residing with the mother and Ben in late January to assist with the child's safety and care.

Respondent-father was a United States Marine at the time Ben's injuries were identified. The Marine Corps entered a Military Protective Order ("MPO") which barred respondent-father from having any contact with the mother or Ben. On 13 February 2023, however, the mother met with respondent-father's command personnel to ask them to rescind the MPO so she could see respondent-father. When command personnel refused to do so, the mother "became belligerent, flipped off said command personnel, and sped out of the parking lot."

After the mother informed DSS that she planned to take Ben out of North Carolina at the end of February, DSS obtained nonsecure custody of the juvenile on 21 February 2023 and placed him in foster care. On the same date, DSS filed a petition alleging that Ben was an abused and neglected juvenile. In each of three subsequent orders on the need for continued nonsecure custody entered between 28 February and 5 April 2023, the district court concluded it was not in Ben's best interest to visit with respondent-father and barred respondent-father and the mother from having contact with each other. On 4 May 2023, in a fourth order on the need for continued nonsecure custody, the court allowed respondent-father one hour of supervised visitation per week.

The abuse and neglect petition was heard on 6 June 2023, and an adjudication and initial disposition order was entered on 10 July 2023 in which Ben was determined to be an abused juvenile as defined in N.C.G.S. § 7B-101(1) and a neglected juvenile as defined in N.C.G.S. § 7B-101(15). In the adjudication portion of the order, the district court made several findings of fact covering the circumstances recounted above. The trial court concluded that reasonable efforts to reunify respondent-father with Ben were not required and ordered respondent-father not to have contact with the mother. The district court did not cease reunification efforts with the mother and afforded her ten hours of supervised visitation with Ben, who was placed with the maternal grandparents.

Respondent-father timely filed notice of appeal from the adjudication and disposition order on 24 July 2023.

## II.    Discussion

In his appeal, respondent-father argues that (1) there were insufficient findings to support the district court's conclusion that reasonable reunification efforts were not required; (2) the court erred in failing to address his visitation rights; (3) the court exceeded its authority in ordering him to have no contact with the mother; and (4) the court exceeded its authority in ordering that efforts to reunify him with Ben to be ceased.

### A.    Standards of Review

In reviewing orders entered under Chapter 7B, uncontested findings of fact are binding on this Court. *In re J.M.*, 384 N.C. 584, 591 (2023). Further, we do not second-guess the district court's "decisions as to the weight and credibility of the evidence, and the inferences drawn from the evidence." *Id.* (quoting *In re D.W.P.*, 373 N.C. 327, 330 (2020)). Moreover,

> dispositional choices—including the decision to eliminate reunification from the permanent plan—are reviewed for abuse of discretion. Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision. In the rare instances when a reviewing court finds an abuse of discretion, the proper remedy is to vacate and remand for the trial court to exercise its discretion. The reviewing court should not substitute its own discretion for that of the trial court.

*Id.* (cleaned up).

### B.    Conclusion of Law that Reunification Efforts were not required

In an initial disposition—which must follow the adjudication of a child as an abused, neglected, and/or dependent juvenile—a district court "shall direct that reasonable efforts for reunification . . . shall not be required" in certain circumstances and upon the entry of written findings supporting the court's decision. N.C.G.S. § 7B-901(c) (2023); *see also In re J.M.*, 384 N.C. at 592. One basis for not requiring reunification efforts is a court's "determination that aggravated circumstances exist because the parent has committed or encouraged the commission of, or allowed the continuation of," *inter alia*, "chronic physical abuse." N.C.G.S. § 7B-901(c)(1)(b)

(cleaned up). A court's "mere declaration" that such aggravating circumstances exist, however, "without explaining what those circumstances are, is not sufficient to constitute a valid finding for purposes of N.C.G.S. § 7B-901(c)." *In re L.N.H.*, 382 N.C. 536, 547 (2022) (citations omitted). Rather, written findings that explain the aggravating circumstances are necessary. *Id.*

Here, the disposition portion of the order appealed from includes a determination that respondent-father "has committed or encouraged the commission of, and/or allowed the continuation of chronic physical abuse of the juvenile." Respondent-father acknowledges that the district court found as fact the following:

> 11. That the juvenile was diagnosed with two rib fractures in different stages of healing; that Respondents were the sole caregivers for the juvenile; and that the Respondents have not offered a plausible explanation for the injuries sustained by the juvenile except for non-accidental means.
>
> 12. That the juvenile's injuries were inflicted on more than one (1) occasion.
>
> 13. That Respondent father admitted that when the juvenile cried, he became frustrated, he held the juvenile tightly, squeezed the juvenile, and shook the juvenile on more than one occasion.
>
> 14. That Respondent father admitted to Detective Peck, Sr. of the Jacksonville Police Department that the Respondent father threw the juvenile in the air and then fumbled or dropped the juvenile, and that Respondent father squeezed the juvenile with a force equivalent to that used to squeeze vice grips.
>
> 15. That Respondent mother admitted that Respondent father was too rough with the juvenile.

> 16. That Respondent father was criminally charged . . . with one count of misdemeanor child abuse; that said charges were dismissed; and that Detective Peck indicated that felony charge(s) were likely to be filed.

But respondent-father characterizes these findings as merely "suggest[ing]" that he broke two of Ben's ribs and failing to "affirmatively state [respondent-father] caused, or encouraged, or allowed Ben to be abused." He notes that the court did not specifically find him at fault for causing Ben's broken ribs and instead found that both he and the mother were Ben's caregivers when the infant's ribs were broken.

This argument is unpersuasive, as respondent-father focuses solely on his son's broken ribs and fails to perceive the import of his admissions that he "held the juvenile tightly, squeezed the juvenile, and shook the juvenile *on more than one occasion*" and "squeezed the juvenile with a force equivalent to that used to squeeze vice grips." (emphasis added). These admissions support the court's conclusion that respondent-father physically abused Ben by shaking him and by squeezing him with the force used to operate a tool[3] on multiple occasions, which is separate and apart from any role that respondent-father played in causing or *allowing to be caused* the child's broken ribs. *See, e.g.*, *In re J.M.*, 384 N.C. at 586–87 (noting that a six-week-

---

[3] The transcript reveals that a DSS social worker testified that when respondent-father admitted this conduct to her, he described squeezing Ben out of frustration with his son's crying and described the force used as hard enough to make the infant "cry harder." She further distinguished between respondent-father giving Ben "a tight squeeze" as opposed to "a gentle hug." The social worker also noted that the mother had disclosed that respondent-father had "a pattern" of being "rough" with the baby, and that this behavior was "frequent."

old juvenile was abused when the child had been squeezed and shaken); *see also In re V.S.O.*, 268 N.C. App. 324, 2019 WL 5718175, at *4 (2019) (unpublished) (noting that the slapping and shaking of an infant could support a determination of physical abuse under N.C.G.S. § 7B-901(c)(1)(b)).

We likewise find no merit in respondent-father's contention that the factual findings here do not support the conclusion that Ben suffered "chronic" physical abuse because the child's injuries were inflicted over the course of *only* two months and consisted of *only* two injuries—noting the broken ribs. Although respondent-father cites *In re V.S.O.* for the proposition that "[t]he term chronic, although not defined in section 7B, is commonly defined as 'lasting a long time or recurring often,' " we find that case unhelpful here because that Court *upheld* the district court's determination that a four-month-old juvenile had suffered *chronic* physical abuse where evidence indicated that the abuse "persisted over [the juvenile's] entire life." *In re V.S.O.*, 268 N.C. App. 324, 2019 WL 5718175, at *4 (citation omitted).

We hold that the findings here—that respondent-father admitted shaking Ben and squeezing his son with the force used on vice grips on more than one occasion over the juvenile's two months of life and that the child also suffered a rib fracture on two distinct occasions—support the court's conclusion that respondent-father "committed or encouraged . . . and/or allowed the . . . chronic physical abuse of the juvenile."

As for respondent-father's emphasis that DSS did not ask the district court to find that reunification efforts with him were not required, we observe that the court was under no obligation to adopt DSS's position in this regard. *See, e.g.*, *In re Rholetter*, 162 N.C. App. 653, 664 (2004) ("North Carolina caselaw is replete with situations where the trial court declines to follow a DSS recommendation." (citation omitted)). "[D]ispositional choices—including the decision to eliminate reunification from the permanent plan—are" instead left to the discretion of the district court. *In re J.M.*, 384 N.C. at 591.

In sum, the district court's conclusion of law that reunification efforts with respondent-father were not required was supported by sufficient written findings, and respondent-father's contention to the contrary is overruled.

### C.  Failure to address visitation rights for respondent-father

Respondent-father next argues that the district court erred in failing to address his visitation rights in its order.[4]  We agree.

Our Juvenile Code mandates that an order which "continues the juvenile's placement outside the home shall provide for visitation that is in the best interests of the juvenile consistent with the juvenile's health and safety, including no visitation." N.C.G.S. § 7B-905.1(a) (2023).  Accordingly, such an "order *must establish a visitation plan for parents unless the* [*district*] *court finds that the parent has forfeited their right*

---

[4] In light of our resolution of this argument, we need not reach respondent-father's alternative position: that a complete denial of visitation was not supported by the court's pertinent findings of fact.

*to visitation or that it is in the child's best interest to deny visitation."* In re N.L.M., 283 N.C. App. 356, 374 (2022) (emphasis added) (citation and internal quotation marks omitted).

Here, the district "court made no finding that [respondent-father] had forfeited [his] right to visitation or that it was in the best interests of [Ben] to deny visitation" and thus the court "was required to provide a plan containing a minimum outline of visitation, such as the time, place, and conditions under which visitation may be exercised." *See In re T.H.*, 232 N.C. App. 16, 34 (2014).[5] Indeed, the order includes no findings of fact or conclusions of law regarding visitation with respondent-father. Therefore "we remand for entry of an order of visitation which clearly defines and establishes the time, place, and conditions under which respondent-father may exercise his visitation rights." *Id.* at 35 (cleaned up).

D.    Prohibition on respondent-father having contact with the mother

Respondent-father next argues that the district court exceeded its authority under N.C.G.S. § 7B-904 when it ordered that he "have no contact whatsoever with" the mother, characterizing this language as a civil "no contact order" under Chapter 50 of the North Carolina General Statutes.[6] Yet respondent-father concedes that

---

[5] On appeal, the GAL does not identify any portion of the order that would satisfy the statutory mandate as discussed in *In re T.H.*, and instead, focuses on whether the existing findings of fact and evidence could support a hypothetical finding that respondent-father had either forfeited his right to visitation with Ben or that visitation would not be in Ben's best interests.

[6] Respondent-father cites N.C.G.S. § 50C-5(a) (2023).

"*[p]erhaps* that power [to bar him from contact with the mother] falls under the umbrella of N.C.G.S. § 7B-904(d1)(3), which allows the [district] court to order parents to 'take appropriate steps to remedy conditions in the home that led to or contributed to the juvenile's adjudication.' " We agree with respondent-father's latter interpretation.

The provision identified by respondent-father permits a district court to order the parent of a juvenile who has been adjudicated to be abused, neglected, or dependent to "[t]ake appropriate steps to remedy conditions in the home that led to or contributed to the juvenile's adjudication or to the court's decision to remove custody of the juvenile from the parent, guardian, custodian, or caretaker." N.C.G.S. § 7B-904(d1)(3) (2023). Thus, a "judge in an abuse, neglect, or dependency proceeding has the authority to order a parent to take any step reasonably required to alleviate any condition that *directly or indirectly* contributed to causing the juvenile's removal from the parental home," *In re B.O.A.*, 372 N.C. 372, 381 (2019) (emphasis added), as long as there is "a nexus between the step ordered by the court and a condition that is found or alleged to have led to or contributed to the adjudication." *In re T.N.G.*, 244 N.C. App. 398, 408 (2015) (citation omitted).

The court here made several findings of fact regarding domestic violence between respondent-father and the mother, including that it was a basis of the initial report DSS received about the family, that the parents "have engaged in acts of domestic violence" and "[t]hat a Military Protective Order was entered, which, in

part, barred the [respondent-father] from having contact with the . . . mother and juvenile." In addition, the social worker testified about the mother's disclosures that when respondent-father was being "rough with the baby" and the mother tried to intervene, respondent-father "would not let her" retrieve the baby. In light of the evidence that respondent-father engaged in domestic violence with the mother and had a pattern of being too rough with Ben, including becoming so frustrated by his infant son's crying that he tightly squeezed and shook the juvenile and refused to allow the mother to take the child from him at those times, we hold that the district court's directive that respondent-father have no contact with the mother was well within its authority under N.C.G.S. § 7B-904(d1)(3) and was not an abuse of discretion.

E.     Order that reunification efforts with respondent-father are "ceased"

In his final argument, respondent-father contends that the district court abused its discretion by acting under a misapprehension of the law when it ordered in the decretal portion of the order that reunification efforts with him "are hereby ceased." "[T]he extent to which [a] trial court exercised its discretion on the basis of an incorrect understanding of the applicable law raises an issue of law subject to de novo review on appeal." *In re A.F.*, 231 N.C. App. 348, 352 (2013) (citation and italics omitted).

As respondent-father contends, and the GAL concedes, while the Juvenile Code permits a district court to determine that reasonable efforts at reunification "shall

not be required," N.C.G.S. § 7B-901(c), it does *not* authorize a court to order DSS to cease reunification efforts with a respondent. *See In re C.B.*, 254 N.C. App. 344, (2017) (unpublished) (noting that the phrase "or shall cease" was removed from the statute in 2015 and citing An Act to Make Various Changes to the Juvenile Laws Pertaining to Abuse, Neglect, and Dependency, S.L. 2015-136, sec. 7, 9, 2015 N.C. Sess. Laws 320, 324-26 (codified as amended at N.C.G.S. § 7B-901(c) (2015)). We observe that the court here employed the correct phraseology from the amended statute in a both a finding of fact and an identically worded conclusion of law in its disposition section: "[t]hat reasonable efforts for reunification . . . *are not required* with [r]espondent[-]father because [he] . . . committed or encouraged . . . and/or allowed the . . . chronic physical abuse of the juvenile." (emphasis added).

In light of its repeated use of the proper statutory language, we do not believe the court's use of the words "are hereby ceased" in the decretal portion of the order indicates "an incorrect understanding of the applicable law," to wit: the scope of district court's authority under section 7B-901(c). *See In re A.F.*, 231 N.C. App. at 352. Rather, we perceive it to be merely an instance of imprecise language on the part of the court.[7] Accordingly, on remand the district court should clarify the

---

[7] Moreover, even if we held that that the district court did misunderstand and attempt to exceed its statutory authority, respondent-father makes no argument regarding prejudice. *See In re C.B.*, 254 N.C. App. 344 (affirming a permanency planning order where the "court exceeded its statutory authority by ordering DSS to cease reunification efforts, [because the] respondent . . . failed to show prejudice").

wording of the third decree in the order so that it conforms to the pertinent statutory language and the court's own proper and supported conclusion of law as to efforts at reunification with respondent-father. *See Porter v. Porter*, 252 N.C. App. 321, 330 (2017) (remanding for clarification of "a poorly worded decretal provision" in an equitable distribution order).

## III.   Conclusion

In conclusion, this matter is remanded for (1) the entry of an order of visitation for respondent-father and (2) clarification of the decretal portion of the adjudication and disposition order.

AFFIRMED IN PART; REMANDED.

Judge CARPENTER concurs.

Judge TYSON concurs in part and dissents in part by separate opinion.

TYSON, Judge, concurring in part and dissenting in part.

I concur, and we all agree the trial court erred and portions of the order must be vacated, and for this cause be remanded for: (1) the entry of an order of visitation for respondent-father; and, (2) compliance of the decretal portion of the adjudication and disposition order with the statute.

The trial court was also without authority to unilaterally cease reunification efforts, or to *sua sponte* order no contact between the married parents in the absence of a Petition for a Domestic Violence Protection Order by mother. Those portions of the orders must also be vacated and remanded. I respectfully dissent.

## I.    Factual Background

"Ben" was born on 21 November 2022 to mother and respondent-father, a married couple. Respondent-father was 20 years old. The young couple and parents lived in Jacksonville, while respondent father actively served our country in the Marine Corps. The parents voluntarily took Ben to the Navy hospital for consecutive days seeking treatment for him on 25 and 26 January 2023.

Ben's paternal grandmother began residing with the mother and Ben in January to assist with the child's safety and care. DSS removed three-month-old Ben from his parents, grandparent, and his home on 21 February 2023 and placed him into foster care with strangers, without first seeking other statutorily-required familial placement. *See* N.C. Gen. Stat. § 7B-903(a1) (2023) ("In placing a juvenile in an out-of-home care under this section, the court *shall first* consider whether a

*relative of the juvenile* is willing and able to provide proper care and supervision of the juvenile in a safe home."(emphasis supplied)).

In three additional orders entered between 28 February and 5 April 2023, and in the absence of a supported conclusion of unfitness or conduct inconsistent with his parental rights, and in disregard of constitutionally-protected marital and parental rights, the district court ordered it was not in Ben's best interest to visit with his father, and *sua sponte* barred any contact between respondent-father and mother, husband and wife, and while respondent-father's mother was present in the family's home to help care for Ben.

On 4 May 2023, and nearly three months after removing the child from his home and family, the court "allowed" respondent-father one hour of supervised visitation per week with his seven months old son.

Respondent-father had admitted to a DSS social worker, he had squeezed and shaken his son out of frustration when Ben cried. Respondent-father also admitted to a Jacksonville Police Department detective that he had once thrown Ben into the air and had failed to catch the child. The detective asserted respondent-father had squeezed Ben "with a force equivalent to that used to squeeze vice grips."

Respondent-father's charge of a single count of misdemeanor child abuse was dismissed. Respondent-father's military command had issued a Military Protective Order ("MPO"), which barred respondent-father from having any contact with the mother or Ben. On 13 February 2023, mother met with respondent-father's

command personnel and asked them to rescind the MPO so she could see her husband.

This meeting between mother and military command occurred a week prior to Ben being forcibly removed from his parents and grandmother at three months old, and being placed outside of his family into foster care on 21 February 2023. Mother had informed DSS she planned to travel with Ben to other family outside of North Carolina at the end of February. Mother was under no travel restrictions, accusations, or charges at that time or now.

The overriding Constitutional and legislative purposes of the Juvenile Code is: (1) to preserve and serve to maintain the family unit; (2) for DSS to offer needed assistance, training, and services to the family; (3) to prevent the removal of a child from his parent's care, custody, and control; and, (4) to reunite the child at the earliest possible times after the conditions leading to removal are ameliorated. *See* N.C. Gen. Stat. § 7B-100, *et. seq.* (2023).

After the hearing on DSS' petition on 6 June 2023, an adjudication and initial disposition order was delayed and not entered until over a month later on 10 July 2023. The district court continued DSS' statutory reunification efforts with mother, eventually placed Ben with the mother's parents, and afforded mother ten hours of supervised visitation.

## II.  Reunification with Respondent-Father

The district court's conclusion that statutory reunification efforts with respondent-father are not required is not supported by supported written findings. We all agree the trial court erred in its conclusion that statutory reasonable efforts to reunify respondent-father with Ben were not required and again ordered, *sua sponte,* respondent-father to have no contact with mother and no visitation schedule with Ben. The order is absolutely devoid of statutorily-mandated findings of fact or conclusions of law regarding mandated visitation with respondent-father. N.C. Gen. Stat. § 7B-901(c) (2023) (Statute does *not* authorize a court to order DSS to cease reunification efforts with a respondent.)

## III.  No Contact with Mother

The district court ordered respondent-father to "have no contact whatsoever with" mother. The majority's opinion affirms this restriction based upon N.C. Gen. Stat. § 7B-904(d1)(3), which authorizes a district court to order a parent to: "[t]ake *appropriate steps to remedy conditions in the home* that led to or contributed to the juvenile's adjudication or to the court's decision to remove custody of the juvenile from the parent, guardian, custodian, or caretaker." N.C. Gen. Stat. § 7B-904(d1)(3) (2023) (emphasis supplied). This belt and suspenders approach grossly overstretches the elastic waist of the statute. *Id.*

The majority's opinion further cites our Supreme Court's opinion in *In re B.O.A.*, 372 N.C. 372, 385, 831 S.E.2d 305, 314 (2019) to support its notion, however, it omits the preceding sentences from the quotation it cited, which provides:

4

> *We do not*, of course, wish to be understood as *hold*ing that *a trial judge's authority* to adopt a case plan pursuant to N.C.G.S. § 7B-904(d1)(3) *is unlimited* or that the reference to the *conditions of removal* contained in N.C.G.S. § 7B-1111(a)(2) *has no meaning whatsoever.* Instead, a trial judge should refrain from finding that a parent has failed to make reasonable progress . . . in correcting those conditions which led to the removal of the juvenile simply because of his or her failure to fully satisfy all elements of the case plan goals.

*Id.* (citations and internal quotation marks omitted)(emphasis supplied).

Our General Statutes provide mechanisms for parties to seek a domestic violence protective order ("DVPO") under N.C. Gen. Stat. § 50B-1(b)(6) (2023) or for a no-contact order under N.C. Gen. Stat. § 50C (2023). The legislature did not intend and the plain language of N.C. Gen. Stat. § 7B-904(d1)(3) does not allow circumvention of these procedures for a *de facto* no contact order to be entered against a married couple on the unpetitioned and *sua sponte* action by the trial court under N.C. Gen. Stat. § 7B-904(d1)(3).

This reading is far too expansive of an interpretation of N.C. Gen. Stat. § 7B-904(d1)(3) to protect respondent-father's and mother's fundamental marital and parental rights, and to prevent communication and work together in a plan to reunify with their child. I respectfully dissent.